**UNITED STATES of America, Plaintiff, Appellee,**

v.

**Bernard V. BAUS, et al., Defendants, Appellants.**

**No. 87–1332.**

United States Court of Appeals, First Circuit.

Heard Oct. 6, 1987.

Decided Dec. 11, 1987.

Richard A. Kaye with whom Kathleen L. Torres and Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., were on brief, for appellants.

Lydia Pelegrin, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before BOWNES, Circuit Judge, TIMBERS,* Senior Circuit Judge, and SELYA, Circuit Judge.

BOWNES, Circuit Judge.

The appellants in this action are guarantors of a loan from the Economic Development Administration (EDA), an agency of the United States Government, to National Medical Products Corporation (NMP), a now-defunct manufacturer of medical supplies in Puerto Rico. When NMP defaulted on the loan, the government filed suit in United States District Court in Puerto Rico to collect on the guaranties. The case was eventually settled and judgment entered

* Of the Second Circuit, sitting by designation.

against the guarantors in accordance with a stipulation of settlement. Seven years later, the government, for the first time, moved to execute its judgment. The guarantors filed a motion for relief from judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure. The district court denied the motion as untimely. The guarantors raise two claims on appeal: (1) the judgment in this case was not a final one because it was contingent upon a further determination of damages by the district court, and (2) the district court abused its discretion in denying the Rule 60(b)(6) motion. We reverse and remand.

## I. BACKGROUND [1]

On April 17, 1970, Bernard V. Baus, Regine Lagier Baus, Samuel H. Casey, Imogene McCraw Casey, Robert S. Warshaw, and Elaine S. Warshaw executed a joint and several guaranty for a $217,800 loan from EDA to NMP. The guarantors were all stockholders in NMP. The EDA loan was secured by a chattel mortgage on all of NMP's machinery and equipment, but the guaranty provided that, in the event NMP defaulted, EDA could collect directly from the guarantors without first exhausting its rights to the collateral. And default NMP did, in December of 1974. At that time, representatives of EDA took possession of NMP's plant and all of its contents, including $100,000 worth of finished products in inventory. On May 28, 1976, the government filed a complaint against the guarantors in Puerto Rico district court seeking to collect $146,277.19, the balance due on NMP's loan.

During the pendency of that action, Gary Fischer, the president of NMP, notified EDA that an unsecured creditor had obtained a judgment against NMP and had attached various items of NMP's machinery which were included in EDA's mortgage. Fischer told EDA that the loss of this crucial equipment would substantially lessen the value of the remaining equipment. He also asked EDA to take measures to secure the plant in order to prevent this kind of illegal attachment, as well as theft and vandalism. EDA took no action at that time and the attached items were auctioned off and removed from the plant.

In March of 1978, the guarantors entered into negotiations with the government to settle the ongoing lawsuit. An agreement in principle was reached and the first draft of a stipulation of settlement circulated on March 20. Under its terms, the guarantors confessed liability in return for the government's promise to attempt to retrieve the equipment attached by the unsecured creditor and "to exhaust their remedies against the entire mortgaged collateral, foreclosing said mortgage in complete or partial satisfaction" of the guarantors' obligation. The first draft was rejected by the guarantors because it provided that they waived all defenses to liability. Thereafter, a second draft was drawn up, which eliminated the waiver of defenses language and also provided that the government would have the mortgaged collateral appraised, the appraisal to serve as a "protective bid" at the auction. This draft was approved and executed by all parties. On May 15, 1978, the district court entered judgment against the guarantors in accordance with the terms and conditions of the stipulation.[2]

After obtaining judgment, the government waited six months before undertaking its promised proceedings against the unsecured creditor and nearly two years before conducting the foreclosure sale in March of 1980. For most of this time, and despite NMP's complaints, the plant remained unlocked and unguarded. As a result, various NMP assets, including the $100,000 worth of finished inventory, were stolen or vandalized. By the time of the public auction, the government could obtain only

---

**1.** The district court made few factual findings. The facts here are drawn largely from the stipulation of settlement and the allegations in the guarantors' verified motions filed in the district court, which have not been disputed by the government.

**2.** The May 15, 1978 judgment was entered only against Bernard Baus, Robert Warshaw, and Samuel Casey. On September 7, 1978, the judgment was amended to include the spouses Regine Baus, Imogene Casey, and Elaine Warshaw.

$37,227 for the assets of NMP; after deduction for expenses, the net proceeds were $12,131.[3] The government's appraisal had placed a $411,000 market value and $128,000 liquidation value on NMP's assets, exclusive of the $100,000 in stolen inventory. The government did not enter a protective bid at the auction.

Immediately following the auction in 1980, the government provided the guarantors with invoices for the goods auctioned off, but it was not until June of 1985 that the guarantors were given a "statement of account" prepared by EDA, indicating their total alleged indebtedness under the stipulation. In the meantime, the guarantors had undertaken negotiations with three successive Assistant United States Attorneys in Puerto Rico to settle their obligation. Each assistant stated that the judgment was not final and that a judicial determination of indebtedness would be necessary before the United States could collect its debt. Each declined to seek such a judicial determination or to execute the judgment. Then, in September of 1984, the government requested that the judgment be certified for registration in another district. Despite the fact that judgments in favor of the United States can be executed in any district without registration, 28 U.S. C. § 2413,[4] the clerk for the United States District Court in Puerto Rico certified the judgment on September 26, 1984, and forwarded it to the United States Attorney for the Southern District of New York. Since only final judgments can be registered, 28 U.S.C. § 1963,[5] the clerk's action amounted to certifying that the judgment was final.

In April of 1985, the United States Attorney in New York demanded full payment of NMP's outstanding debt from Robert and Elaine Warshaw, who were residents of New York. Instead of a challenge to the judgment in New York, a motion for relief from judgment was filed in the United States District Court for Puerto Rico. In support of their Rule 60(b)(6) motion, the guarantors set forth a number of verified factual allegations relating to the execution of the stipulation and subsequent events.[6] The gist of the guarantors' argument was that the government had breached its obligations under the settlement agreement, both by the way it foreclosed on NMP's assets and by attempting to execute the judgment without a judicial determination of indebtedness, and thus was not entitled to enforce the agreement against the guarantors.

The guarantors also pointed out to the district court that the ninth paragraph of the stipulation, as written, contained a typographical error and was incomplete. The pertinent portion of the paragraph reads:

> 9. In consideration of the above, defendants acknowledge their debt as guarantors and agree to pay plaintiff for any possible deficiency outstanding after plaintiff auctions the mortgaged collateral and hereby confess to judgment up to the amount of *said possible 30 days* from the date of the auction; in compliance with the agreement of the parties, the details of which are set forth below....

(Emphasis indicates place of omitted language). In the first draft, the waiver of defenses language had appeared between

---

**3.** The expenses were largely attributable to the cost of security guards which the government began posting on December 29, 1979, *after* the finished inventory had disappeared.

**4.** 28 U.S.C. § 2413 provides:

> A writ of execution on a judgment obtained for the use of the United States in any court thereof shall be issued from and made returnable to the court which rendered the judgment, but may be executed in any other State, in any Territory, or in the District of Columbia.

**5.** 28 U.S.C. § 1963 provides in pertinent part:

> A judgment in an action for the recovery of money or property now or hereafter entered in any district court which has become final by appeal or expiration of time for appeal may be registered in any other district by filing therein a certified copy of such judgment. A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

**6.** Additional factual allegations are contained in the guarantors' verified reply to the government's motion to dismiss.

the words "possible" and "30 days," but, in the process of deleting that language, some additional language was also inadvertently deleted. The guarantors claimed that the language inadvertently deleted gave them the right to retain all defenses and objections, that the parties intended the final stipulation to read as follows:

> 9. In consideration of the above, defendants acknowledge their debt as guarantors and agree to pay plaintiff for any possible deficiency outstanding after plaintiff auctions the mortgaged collateral and hereby confess to judgment up to the amount of said possible [deficiency, retaining all possible defenses and objections, said confessed judgment to be final and enforceable within] thirty (30) days from the date of the auction, in compliance with the agreement of the parties, the details of which are set forth below. . . .

(Brackets indicate guarantors' claimed language).

The government moved to dismiss the guarantors' motion but neither submitted counteraffidavits nor contested any of the factual allegations made by the guarantors. Rather, relying on the guarantors' allegations, the government argued that the motion was untimely and failed to put forth sufficient justification for extraordinary relief under Rule 60(b)(6). The government made no argument regarding the missing language in paragraph nine of the stipulation.

In a short opinion, the district court agreed with the government:

> We find that defendants, who were aware of the foreclosure proceedings held on March 10, 1980, have failed to assert any justifiable grounds for waiting over five years before coming to the Court to complain of the Government's alleged breach of its duties under the stipulation.
>
> Even assuming defendants' position is correct and that it was for the Court to assess the deficiency, the stipulation provided that this be done within 30 days from the sale. Thus, defendants have been aware since 1980 of the alleged breach of the stipulation they are raising at this time.

The judge never explicitly ruled on guarantors' attempt to read additional language into the stipulation at the point of the typographical error. In denying the guarantors' motion, the court did note, however, that "we do not read the stipulation as defendants do" and, when quoting the pertinent portion of the stipulation, inserted the word "deficiency" to make the affected sentence read as follows:

> [D]efendants acknowledge their debt as guarantors and agree to pay plaintiff for any possible deficiency outstanding after plaintiff auctions the mortgaged collateral and hereby confess to judgment up to the amount of said possible [deficiency] 30 days from the date of the auction. . . .

This appeal followed.

## II. FINALITY

By its own terms, Rule 60(b) applies only to final judgments.[7] *See Campos v. Puerto Rico Sun Oil Co.,* 536 F.2d 970, 972 n. 6 (1st Cir.1976). In ruling on the guarantors' Rule 60(b)(6) motion, therefore, the district court inferentially held that the stipulated judgment was a final one. The guarantors

---

**7.** Rule 60(b) provides in pertinent part:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrin-

sic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

now argue that this was error. Initially, we note that this argument comes somewhat suspectly from the guarantors, since it was they who requested Rule 60(b)(6) relief, and only Rule 60(b)(6) relief, in the district court.[8] Nevertheless, the guarantors did argue to the district court that the stipulation was contingent upon further judicial proceedings. If that were true, the judgment would not be final, and so we cannot say that the argument has been waived. At any rate, we hold that the judgment was final.

The stated test for finality under Rule 60(b), like that of Rule 54, is whether the judgment is appealable. *Solaroll Shade and Shutter Corp. v. Bio–Energy Systems, Inc.*, 803 F.2d 1130, 1131 (11th Cir. 1986). We recognize that while a consent judgment may become the final judgment of a court, it is not "appealable" in the usual sense. Nevertheless, by treating the provisions of a consent judgment as if they were part of a judicial decision on the merits, the appealability test can be a useful tool for determining finality. We also realize that finality "is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality." *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964). *See also Massachusetts Ass'n for Retarded Citizens v. King*, 643 F.2d 899, 904 n. 12 (1st Cir.1981).

The Court has said that, traditionally, an appealable final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Stringfellow v. Concerned Neighbors in Action*, — U.S. ——, 107 S.Ct. 1177, 1181, 94 L.Ed.2d 389 (1987) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). In determining whether the litigation on the merits has ended, a practical rather than a technical approach should be

used. *Brown Shoe Co. v. United States*, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). The Court has also called for a balancing of two "competing considerations": "the inconvenience and cost of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Gillespie*, 379 U.S. at 152–53, 85 S.Ct. at 311 (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 94 L.Ed. 299 (1950)).

■ The guarantors' finality argument is a simple one: when the parties signed the stipulation, they contemplated that the district court would have to make a final determination of indebtedness, therefore the judgment is not final. That argument, in turn, relies strongly on the language that the guarantors would read into the stipulation at the place of the typographical error. If, as the guarantors argue, the stipulation provided that they were to retain all defenses, then by implication it could not have been executed prior to a judicial consideration of those defenses. The district court, however, did not read the stipulation in that way but instead inserted the word "deficiency" to fill the gap. Since the issue of the missing words was squarely before the district court, we interpret the court's action as a finding of fact and, under the circumstances, we cannot say that it was clearly erroneous. *See* 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.28[3], at 60–325 (1987) (findings of fact in Rule 60(b) determinations are subject to clearly erroneous rule). We must, therefore, read the stipulation as found by the district court.

So read, the stipulation and judgment are final. The stipulation both established the liability of the guarantors and set a formula for damages. *Cf. United States v. One Hundred Nineteen Thousand Nine Hundred Eighty Dollars*, 680 F.2d 106, 107 (11th Cir.1982) (where stipulated judgment resolved both liability and damages, it was

---

**8.** The guarantors' original Rule 60(b)(6) motion did request a stay under Rule 62(b), but only as

an interim matter pending disposition of the Rule 60(b)(6) motion.

final for Rule 60(b) purposes). All that remained was for the government to carry out the foreclosure sale in accordance with the stipulation. It was, of course, possible—and indeed turned out to be the case—that the parties would dispute the adequacy of the government's handling of the foreclosure. But the *possibility* of such a dispute does not necessarily undermine finality. A somewhat analogous case is *Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). In *Bell*, the United States Department of Education had issued orders assessing deficiencies against two states, but leaving for further "discussion" the *method* of payment. The question then arose whether the orders were final and the Supreme Court said:

> The possibility of further proceedings in the agency to determine the method of repayment does not, in our view, render the orders less than "final." The situation here corresponds to the ordinary adjudication by a trial court that a plaintiff has a right to damages. Although the judgment in favor of the plaintiff is not self-executing and he may have to undertake further proceedings to collect the damages awarded, that possibility does not prevent appellate review of the decision, which is final.

*Id.* at 779, 103 S.Ct. at 2191. Likewise here, we do not think that the possibility of future proceedings—including the present ones—prevented the judgment from becoming final.

To bolster their argument, the guarantors cite *Laffey v. Northwest Airlines, Inc.*, 642 F.2d 578 (D.C.Cir.1980). But *Laffey* is clearly distinguishable. The court order at issue in *Laffey* had determined the appropriateness of injunctive relief only, and left the issue of damages for future negotiation between the parties. The *Laffey* district court also said that any disputes relating to the negotiated damages should be referred to it for disposition. *Id.* at 584. Here, however, the issue of damages *was* resolved by the stipulation and the court did not indicate that it contemplated any further judicial intervention.

Although not specifically designed for judgments pursuant to settlement agreements, we think that the balancing of competing considerations proposed by the Supreme Court in *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950), provides a useful tool for analyzing finality in this case. On the one hand, the inconvenience and costs of piecemeal review lies in the fact that the government undertook certain obligations under the stipulation and, if the judgment was final, there would be no way to enforce those obligations short of a motion to set aside the judgment or a separate action for breach of contract. As already noted, however, we believe that a dispute over the government's performance is sufficiently collateral to the underlying action so as not to preclude finality, especially since Rule 60(b) provides a mode of relief short of filing an entirely new action.

The competing consideration under *Dickinson* is the danger of denying justice through delay. The pertinent delay here is that of the government in being unable to enforce its judgment prior to the conclusion of an additional judicial determination. Through its own seven-year delay, the government has shown that speedy resolution of this case was not a primary concern. Moreover, we do not think that a short hearing following the foreclosure sale would have unduly hindered the government, even if it had been diligent. If, however, we treat the stipulation as if it were a judicial decision on the merits, the possibility of delay becomes a much more serious concern. With the central issues of liability and damages resolved, we think it would subvert the finality doctrine to indefinitely postpone the parties' rights to appeal because of the possibility that, in the future, one of the parties might not live up to its obligations under the judgment. If a decision on the merits containing the same provisions as the stipulation would have been appealable, it follows that the stipulated judgment in this case was final for Rule 60(b) purposes. *Cf. Bostick Foundry v. Lindberg*, 797 F.2d 280, 283 (6th Cir. 1986) ("Once concluded, a settlement is as binding, conclusive, and final as if it had

been incorporated into a judgment...."), *cert. denied,* — U.S. —, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987); *Zimmerman v. Quinn,* 744 F.2d 81, 82 (10th Cir.1984) (consent judgments are indistinguishable from litigated judgments for purposes of Rule 60(b) relief). We next consider the guarantors' request for relief from judgment under Rule 60(b)(6).

### III. THE GUARANTORS' RULE 60(b)(6) MOTION

The standard of review for denial of a Rule 60(b)(6) motion is simply stated. "For the purpose of this opinion, we take the facts to be as the [guarantors] allege, for all we are to do on this appeal is determine whether those allegations, if proved, would justify relief." *United States v. Cirami,* 563 F.2d 26, 28 (2d Cir.1977); *see also United States v. Karahalias,* 205 F.2d 331, 333 (2d Cir.1953).

#### A. *Timeliness*

The district court's decision was based solely on the ground that the guarantors waited too long after the foreclosure sale to file their motion for relief from judgment. Because a Rule 60(b)(6) motion is addressed to the sound discretion of the district court, *Chang v. Smith,* 778 F.2d 83, 85 (1st Cir.1985), we can reverse that decision only if the district court's failure to find a justification for the guarantors' delay is so unwarranted as to constitute an abuse of discretion. *United States v. Berenguer,* 821 F.2d 19, 20 (1st Cir.1987).

Rule 60(b) contains two separate time limits. Subsections (1) through (3), granting relief on account of mistake, excusable neglect, newly discovered evidence, fraud, or other misconduct, carry an absolute one-year time limit. *Berenguer,* 821 F.2d at 21; *Chang,* 778 F.2d at 85. Motions filed under subsections (4) through (6), which cover relief from void or discharged judgments, from judgments which should no longer have prospective application, or for "any other reason," need only be filed within a "reasonable" time. For that reason, and because subsection (6) has a catch-all quality, relief under subsection (6) is only

appropriate where subsections (1) through (5) do not apply. *Klapprott v. United States,* 335 U.S. 601, 613, 69 S.Ct. 384, 389, 93 L.Ed. 266, *modified,* 336 U.S. 942 (1949); *Chang,* 778 F.2d at 85. In determining temporal reasonableness under subsection (6), we must review "the specific circumstances of the case," while bearing in mind that subsection (6) relief "is reserved for extraordinary cases in which the unusual circumstances justify a party's delay." *Berenguer,* 821 F.2d at 21. *See also Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950) (denying relief under subsection (6) for failure to establish extraordinary circumstances).

This case comes to us in a procedural posture similar to that presented to the Supreme Court in *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, *modified,* 336 U.S. 942 (1949). The petitioner in *Klapprott* was born in Germany, but in 1933 was granted a certificate of naturalization as an American citizen. Nine years later, the government moved in United States District Court to revoke the petitioner's citizenship on the ground that his oath of allegiance had been falsified. During the sixty days that the petitioner had to answer the complaint, he was arrested on separate criminal charges and confined in a federal prison. For the next four and a half years, the petitioner was held continuously on a series of charges, all of which were eventually overturned by the courts. Meanwhile, when the petitioner failed to answer the government's complaint, a default judgment was entered against him and his certificate of naturalization cancelled. In moving for relief from default, the petitioner set forth a series of factual allegations relating to his inability to defend the denaturalization proceedings while in federal custody. The government did not deny any of the alleged facts.

While accepting the undenied allegations as true, the district court denied the requested relief, citing a four-year delay in filing for relief as "willful and inexcusable neglect." 335 U.S. at 603, 69 S.Ct. at 385. The court of appeals affirmed, but the Supreme Court reversed. Agreeing with the

district court that the petitioner's undenied factual allegations must be accepted as true, the Court found that they "certainly" justified the petitioner's delay in filing for relief. *Id.* at 615, 69 S.Ct. at 390. For one thing, the default was entered "at a time when [the] Government was then holding the citizen in jail with no reasonable opportunity for him effectively to defend his right to citizenship." *Id.* Finding that Rule 60(b)(6) "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," the Court said that, based on the allegations before it, the default judgment should be set aside. *Id.*

Likewise here, the guarantors have set forth a number of verified and uncontested factual allegations relating to their delay in seeking Rule 60(b)(6) relief. Treating these allegations as true, our task is to decide whether there are any extraordinary and unusual circumstances in this case which justified the guarantors in waiting until after the government's belated effort to execute the judgment to file their motion for relief. We think that there are. Accordingly, we hold that the district court abused its discretion in denying the motion without a hearing.

First, the uncontroverted affidavits before the district court established that, during the period between the foreclosure sale in 1980 and the request for certification of judgment in 1984, three successive Assistant United States Attorneys assured the guarantors that the government would not attempt to collect on the guarantors' obligation until there had been a judicial determination of indebtedness. This government assurance to the guarantors was not addressed by the district court. Although it is sometimes permissible to proceed on affidavits alone in ruling on a Rule 60(b)(6) motion, *see* 7 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 60.28[3], at 60–324 to 325 (1987), a district court following that course cannot ignore one party's uncontested allegations. Here, the government filed no counteraffidavits nor otherwise challenged the sworn allegations contained in the guarantors' motions. As succinctly stated in its motion to dismiss, the government's position was "that the allegations set forth in defendants' motion preclude application of [Rule 60(b)(6)]."

We think it irrelevant that the stipulated judgment is a final one not necessitating further judicial action. The point is that, because the government initially promised not to execute on the judgment until there had been a judicial determination of indebtedness, the guarantors had no reason to file their Rule 60(b)(6) motion prior to the time the government changed its mind in 1985 and undertook collection.

In addition to its repeated promises not to immediately execute on the judgment, the government's substantial delay in actually attempting to enforce its rights under the stipulation is a second important factor bearing on the reasonableness of the guarantors' delay. The government harshly criticizes the guarantors for waiting five years after the foreclosure sale to file their Rule 60(b)(6) motion, but is unable to explain its own lack of diligence in waiting seven years after the signing of the stipulation to ask for payment. Such a lengthy delay could have created the impression in the guarantors that the government was simply not interested in pursuing the matter at all. The government's delay takes on greater significance in light of a third factor: the government's apparent breach of its own obligations under the stipulation.

The stipulation provides that the foreclosure proceeds, with the protective bid amount as a minimum, would be applied "in complete or partial satisfaction" of the guarantors' debt. Yet the government waited two years to hold a foreclosure sale —during which time many of the goods in its possession were stolen or destroyed— and failed to enter a protective bid at the auction. We need not decide here the merits of the claim that the government breached its contractual obligations. For the purpose of determining whether the motion was filed within a "reasonable" time, the appropriate inquiry is simply whether the guarantors' conclusion that a material breach had occurred was a reasonable one. We think that it was. The guarantors had good reason to think that the

government would not, perhaps could not, force them to honor the settlement agreement. Further, as a result of the government's apparent breach, the amount owing under the agreement, if any, was a matter of considerable uncertainty. To be sure, the government provided the guarantors with receipts from the 1980 auction and, with these, the guarantors could have mechanically calculated their potential liability under the stipulation of settlement. But until EDA provided a statement of account in 1985, the guarantors had good reason to believe that the government would credit them with the appraised value of the collateral or allow some other offset to compensate for the government's failure to treat the appraisal as a protective bid. No one has suggested that, once the government did announce its intention to hold the Warshaws to the entire $146,277.19 deficiency, the guarantors did not act promptly to have the judgment set aside in Puerto Rico.

■ Thus, while we recognize that the district court has considerable discretion in disposing of Rule 60(b)(6) motions, we find that the circumstances of this case do not support the district court's conclusion that the motion was time-barred because it was not filed immediately after the foreclosure sale. It would result in manifest unfairness to deny relief to the guarantors on account of their failure to seek Rule 60(b)(6) relief prior to the government's 1985 collection effort, when: (1) the government lulled the guarantors into delaying through its promises, (2) the government itself delayed two years in holding a foreclosure sale and another five years in demanding payment, and (3) the government apparently breached its obligations under the settlement agreement. The government especially should not be allowed by words and inaction to lull a party into a false sense of security and then by an abrupt volte-face strip the party of its defenses without a hearing.

### B. *Extraordinary Circumstances*

Even if timely filed, the Rule 60(b)(6) motion for relief from judgment must still establish that there are extraordinary cir-

cumstances warranting relief in order for the guarantors to prevail. *See Ackermann*, 340 U.S. at 199–202, 71 S.Ct. at 212–14; *Berenguer*, 821 F.2d at 21. The extraordinary circumstances claimed by the guarantors relate to the government's alleged twofold breach of its obligations under the settlement agreement: its failure to enter a protective bid at the auction, and its failure to safeguard NMP's assets pending the sale. The issue of the government's alleged breach was before the district court, having been briefed both by the guarantors and by the government, but, because the district court found the motion time-barred, the question was not reached. On appeal, the merits of the guarantors' claim for relief, as well as the timeliness issue, has again been presented by the parties.

Faced with a similar situation in *Klapprott*, the Supreme Court relied on the petitioner's undenied allegations to reach the merits of whether there were sufficient extraordinary circumstances for relief from judgment. It decided that there were, and its original decision read: "The judgments accordingly are reversed and the cause is remanded to the District Court with instructions to set aside the judgment by default...." 335 U.S. at 616, 69 S.Ct. at 391. Without explanation, this judgment was later modified to read: "The judgment of the Court of Appeals is reversed and the cause is remanded to the District Court with directions to receive evidence on the truth or falsity of the allegations contained in petitioner's petition to vacate the default judgment entered in the denaturalization proceedings." 336 U.S. at 942, 69 S.Ct. 391. Later courts, interpreting this modification, have held that when reviewing a district court denial of a Rule 60(b)(6) motion based on uncontested allegations, the appropriate course is for the court of appeals to decide whether the allegations, if proven, would justify relief. If so, the district court should be directed to hold an evidentiary hearing in order to determine if the allegations are indeed true; if not, the district court's decision should be affirmed. *See United States v. Cirami*, 563 F.2d 26, 28–29 (2d Cir.1977); *United States v. Kar-*

*ahalias,* 205 F.2d 331, 333 (2d Cir.1953); *United States v. Backofen,* 176 F.2d 263, 269 (3d Cir.1949).

Thus, while we have already held that the district court erred in dismissing the motion on timeliness grounds, we go on to consider whether, on the facts presented, the guarantors have made out a claim for relief under Rule 60(b)(6). As a legal matter, it is well-accepted that the material breach of a settlement agreement which has been incorporated into the judgment of a court entitles the nonbreaching party to relief from judgment under Rule 60(b)(6). *See, e.g., Fairfax Countywide Citizens Ass'n v. Fairfax County,* 571 F.2d 1299, 1302–03 (4th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978); *Aro Corp. v. Allied Witan Co.,* 65 F.R.D. 513, 514 (N.D.Ohio 1975), *aff'd,* 531 F.2d 1368, 1371 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *McGoff v. Rapone,* 78 F.R.D. 8, 23 (E.D.Pa. 1978). This accords with the purpose of Rule 60(b)(6). "Where the [settlement] agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." *Warner v. Rossignol,* 513 F.2d 678, 682 (1st Cir.1975). Material breach of such a solemn obligation presents an extraordinary situation of permitting a party to benefit from a judgment the terms of which it has deliberately disregarded. Since the guarantors had no opportunity to raise the government's alleged breach, their only remedy, if the judgment is not vacated, would be to pay out the disputed amount and then try to recoup the money in a separate action for breach of contract.

■ We must, therefore, on the facts alleged, decide whether the government has materially breached its obligations under the settlement agreement. The first breach claimed by the guarantors relates to paragraph 9(e) of the stipulation, which provides: "Plaintiff will have the chattels to be foreclosed appraised by an official appraiser of the Small Business Administration, and the value assigned them will serve as a protective bid at the foreclosure sale." While such an appraisal was made, the government did not enter a protective bid at the auction. The government now argues that the stipulation should be read so as not to actually require it to *enter* a protective bid. According to the government's brief, the stipulation provides that the appraised value "was to serve as [a] protective bid, not that S.B.A. was going *to make* the protective bid." (Emphasis in original). The government offers no substantiation for this conclusory assertion, which is unsupportable on the record before us.

The Small Business Administration—which was representing EDA in the matter of the NMP loan—routinely makes and enters protective bids at auctions when it forecloses on outstanding debts. *E.g., United States v. Warwick,* 695 F.2d 1063, 1066 (7th Cir.1982); *McIntyre v. Ticor Title Ins. Co.,* 658 F.Supp. 944, 947 (D.Alaska 1986); *United States v. Champion Sprayer Co.,* 500 F.Supp. 708, 710 (E.D.Mich. 1980). The purpose of a protective bid, in the SBA's own words, is "to insure that the equipment does not sell at less than its under-the-hammer value; that it doesn't sell too cheaply." *United States v. Whitehouse Plastics,* 501 F.2d 692, 696 (5th Cir. 1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975). Obviously, that purpose, or indeed any purpose at all, would not be served if the SBA simply appraised NMP's assets for the purpose of establishing what a protective bid might be, without actually making the bid at the auction. The appraisal could not possibly "serve" as a protective bid, as the stipulation requires, unless the government entered the bid at the auction. On the facts before us, we therefore reject the government's interpretation of the agreement and hold that the government was obliged under the agreement to enter a protective bid at the auction. The government's failure to do so was a material breach.

Although, as we note below, the stipulation of settlement is a contract superseding the original guaranty, it still evidences the guarantors' debt to the government in relation to NMP's loan and, as such, must be

construed as a matter of federal law. 13 C.F.R. § 101.1(d)(2) (1987).[9] In determining materiality in federal contract law, courts look to all the circumstances surrounding the contract and the breach and are also guided by general principles of contract law and the Restatement (Second) of Contracts (1979). *Eastern Illinois Trust & Sav. Bank v. Sanders,* 826 F.2d 615, 616 (7th Cir.1987); *Ferrell v. Secretary of Defense,* 662 F.2d 1179, 1181 (5th Cir.1981). Here, the factors set forth in section 241 of the Restatement,[10] as well as good sense, dictate that the breach was material. First, because no protective bid was entered, the guarantors received only a credit of $37,227 for the assets auctioned off instead of the $128,000 appraised value they reasonably expected, and, second, the government has not offered to cure its breach nor otherwise indicated an intention to deal in good faith with the guarantors. This means that, based on the facts before us, the judgment entered pursuant to the settlement agreement should be vacated. The case must be remanded to the district court for a hearing at which the truth or falsity of the guarantors' allegations can be determined.

■ At that time, the district court should also consider the second breach alleged by the guarantors: the government's failure to proceed diligently and in good faith when foreclosing on NMP's assets. The guarantors argue that as a result of the government's failure to safeguard the NMP assets in its possession, the goods

were stolen and vandalized and their value substantially diminished by the time of the auction, leaving the guarantors with an inadequate credit. The government has not argued—either in the district court or on appeal—that it in fact acted diligently. Rather, its position is this: "The stipulation does not require the United States to proceed diligently, post guards or protect the factory in other ways. If Defendants–Appellants wanted this wording in the stipulation they should have included it there." The government is, of course, correct to the extent it claims that the stipulation does not explicitly provide that the government had to act diligently in protecting the loan collateral prior to the auction. The guarantors are not, however, simply relying on a literal reading of the stipulation. Rather, they point to the established obligations of a mortgagee in possession diligently to protect the collateral in its possession, even when such an obligation is not reduced to writing in a particular agreement. The government's answer to this is the waiver of defenses clause in the original guaranty but, as set out below, we think that this waiver argument misses the point.

It is well-established that when a secured creditor seizes and disposes of loan collateral after a default, the creditor must do so in good faith and in a commercially reasonable way. This obligation is incorporated into the Uniform Commercial Code, which has been enacted in forty-nine states and the District of Columbia.[11] While, as we

---

**9.** Section 101.1(d)(2) provides:

Instruments evidencing a loan, obligation of security interest in real or personal property payable to or held by the Administration or the Administrator, such as promissory notes, bonds, guaranty agreements, mortgages, deeds of trust, and other evidences of debt or security shall be construed and enforced in accordance with applicable Federal law.

**10.** Section 241 provides:

Circumstances Significant in Determining Whether a Failure Is Material
In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

**11.** U.C.C. § 9–504 provides in relevant part:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following

have noted above, the stipulation and guaranty must be construed as a matter of federal law, the courts in applying federal law in this area have repeatedly referred to the U.C.C. because it supplies a well-accepted and uniform rule. *United States v. Cain*, 736 F.2d 1195, 1197 (7th Cir.1984); *United States v. Willis*, 593 F.2d 247, 251–54 (6th Cir.1979); *United States v. Conrad Pub. Co.*, 589 F.2d 949, 953 (8th Cir.1978); *United States v. Terrey*, 554 F.2d 685, 691–93 (5th Cir.1977). A secured creditor's duty of commercial reasonableness under the U.C.C. includes diligently safeguarding loan collateral in its possession. *E.g., Bank of Josephine v. Conn*, 599 S.W.2d 773 (Ky.Ct.App.1980); T. Quinn, *Quinn's Uniform Commercial Code Commentary and Law Digest* ¶ 9–504[A][4][k] (Cum. Supp. No. 2 1986). Where a creditor does not act in a commercially reasonable way, the debtor may either defend collection proceedings under section 9–504 on that ground or may affirmatively seek to restrain the creditor before sale under section 9–507(1).[12] *Willis*, 593 F.2d at 257–58. Moreover, absent an effective waiver of defenses, the duty of commercial reason-

ableness has been said to extend to guarantors as well as the primary debtor. *E.g., Willis*, 593 F.2d at 254–56 (collecting cases); *Terrey*, 554 F.2d at 691–93.

As the government points out, the original guaranty did contain a clause waiving all defenses, including all rights to the loan collateral. This court and other courts have upheld this exact waiver of defenses clause, which is part of the SBA standard form guaranty, and have said that once guarantors agree to this clause, the SBA does not owe them a duty of commercial reasonableness in handling loan collateral. *United States v. Mallett*, 782 F.2d 302, 302–04 (1st Cir.1986); *United States v. Cain*, 736 F.2d 1195, 1197–99 (7th Cir. 1984); *United States v. H & S Realty Co.*, 647 F.Supp. 1415, 1417–25 (D.Me.1986). But contrary to the government's assertion, these cases are inapposite here, because the guaranty has been superseded by a stipulation of settlement. Unlike the guaranty, the stipulation does oblige the government to foreclose on the loan collateral in satisfaction of the guarantors' debt. In upholding the waiver clause in *Mallett*, we explicitly noted that the government

any commercially reasonable preparation or processing.
. . . .
(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.
U.C.C. § 9–207 provides in relevant part:
(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession.
. . . .
(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by the preceding subsections but does not lose his security interest.
U.C.C. § 1–203 provides:
Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement.

12. U.C.C. § 9–507(1) provides in relevant part: If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions.

Comment No. 1 to section 9–507(1) provides in relevant part:
The principal limitation on the secured party's right to dispose of collateral is the requirement that he proceed in good faith (Section 1–203) and in a commercially reasonable manner. See Section 9–504. In the case where he proceeds, or is about to proceed, in a contrary manner, it is vital both to the debtor and other creditors to provide a remedy for the failure to comply with the statutory duty. This remedy will be of particular importance when it is applied prospectively before the unreasonable disposition has been concluded. This Section, therefore, provides that a secured party proposing to dispose of collateral in an unreasonable manner, may, by court order, be restrained from doing so, and such an order might appropriately provide either that he proceed with the sale or other disposition under specified terms and conditions, or that the sale be made by a representative of creditors where insolvency proceedings have been instituted. The Section further provides for damages where the unreasonable disposition has been concluded, and, in the case of consumer goods, states a minimum recovery.

had not made such a superseding promise to the guarantors. 782 F.2d at 303. The law is clear that in construing the government's obligations under the stipulation, the merits of its underlying claim on the guaranty are irrelevant. *See Bostick Foundry v. Lindberg,* 797 F.2d 280, 283 (6th Cir.1986) (once a settlement agreement is concluded, the merits of the antecedent claims will not thereafter be examined), *cert. denied,* —— U.S. ——, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987); *Clinton Street Greater Bethlehem Church v. City of Detroit,* 484 F.2d 185, 189 (6th Cir.1973) (same); *Autera v. Robinson,* 419 F.2d 1197, 1201 n. 17 (D.C.Cir.1969) (same). To the extent the government had an obligation of commercial reasonableness in handling NMP's assets under the stipulation of settlement, it was therefore unaffected by the waiver of defenses language in the guaranty.

Based on the facts before us, it seems likely that a breach of the government's commercial reasonableness obligation has occurred, but the guarantors' allegations are incomplete on this point. Since the case must be remanded for an evidentiary hearing in the district court on the grounds set out above, we think that the best course is for the district court, at that time, to make a determination on the alleged breach of the commercial reasonableness obligation as well. A material breach of that obligation would, of course, constitute an independent ground for vacating the judgment entered pursuant to the settlement agreement.

Should the district court vacate the judgment on account of material breach, we note that it also has the power to enforce the settlement agreement, which is a contract, and to determine the amount owed, if any, by the guarantors to the government. *See, e.g., Joy Mfg. v. National Mine Serv. Co.,* 810 F.2d 1127, 1128 (Fed.Cir.1987); *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1371 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976); *Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir.1974); *Lichtenstein v. Lichtenstein,* 454 F.2d 69, 71 (3d Cir.1972). This power to enforce "has its basis in the policy favoring settlement of disputes and the avoidance of costly and time-consuming litigation." *Kukla v. National Distillers Prods. Co.,* 483 F.2d 619, 621 (6th Cir.1973). In order to ensure that settlement agreements are an effective form of dispute resolution, district courts who enter judgment pursuant to such an agreement necessarily have the power to mandate compliance with it. *Mathewson Corp. v. Allied Marine Indus., Inc.,* 827 F.2d 850, 852 (1st Cir.1987) ("Without doubt, a district court possesses the authority to insure due compliance with [a court-approved settlement]."). [13]

## IV. SUMMARY

On remand, the district court shall hold a hearing and determine first whether the

---

13. We recognize that some courts have recently questioned a district court's ability to enforce a settlement agreement in some situations. *E.g., McCall–Bey v. Franzen,* 777 F.2d 1178 (7th Cir. 1985); *Londono v. City of Gainesville,* 768 F.2d 1223, 1227 (11th Cir.1985); *Fairfax Countywide Citizens Ass'n v. Fairfax County,* 571 F.2d 1299, 1302–03 (4th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). These cases are grounded in a strict view of federal subject matter jurisdiction, the idea being that while federal courts necessarily have the power to vacate their own judgments, they do not necessarily have jurisdiction to hear collateral disputes arising under state contract law, at least not where the district court has not explicitly retained jurisdiction, *McCall–Bey,* 777 F.2d at 1186–90, or where the district court has not approved of the settlement agreement and incorporated it into an order of the court, *Fairfax,* 571 F.2d at 1303 n. 8, or where there is not

some independent basis for federal jurisdiction over the contract dispute. *Fairfax,* 571 F.2d at 1303 n. 8. Not all courts have agreed with the *McCall–Bey/Londono/Fairfax* approach, however, and some still maintain that federal courts have inherent jurisdiction to enforce settlement agreements. *E.g., Kent v. Baker,* 815 F.2d 1395, 1398–1400 (11th Cir.1987) (disagreeing with *Londono* ); *Joy Mfg. v. National Mine Serv. Co.,* 810 F.2d 1127, 1128 (Fed.Cir.1987); *Bostick Foundry v. Lindberg,* 797 F.2d 280, 283 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987); *Estate of Jones v. Commissioner of Internal Revenue,* 795 F.2d 566, 573 (6th Cir.1986). In this case, it is unnecessary to choose sides in this ongoing debate. Where the United States is a party, the federal courts have jurisdiction over the contract dispute. U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. §§ 1345–46.

guarantors can prove the affidavit allegations as to the delay in filing their Rule 60(b)(6) motion. If the court finds that they are proven, then the guarantors shall have an opportunity to prove alleged breaches of the stipulation. If the court finds that one or both of the alleged breaches has been proven, then the motion for relief from judgment shall be granted.[14]

*Reversed and remanded.*

14. We leave it for the district court to make the requisite findings of fact in this regard; nothing contained herein should be construed as expressing any opinion on our part as to whether or not any of the alleged breaches occurred.